IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
CORPUS CHRISTI DIVISION

| | | |
|---|---|---|
| IN RE COMPLAINT AND PETITION § | | |
| OF THE FR8 PRIDE SHIPPING CORP. § | | |
| AND THOME SHIP MANAGEMENT § | | |
| PTE. LTD., AS OWNER AND § | | C.A. NO. C-12-185 |
| TECHNICAL MANAGER OF FR8 § | | |
| PRIDE, HER ENGINES, TACKLE, ETC., § | | Admiralty Fed. R. Civ. P. 9(h) |
| IN A CAUSE OF EXONERATION § | | |
| FROM OR LIMITATION OF § | | |
| LIABILITY § | | |

## OPINION SETTING BOND ON A VESSEL

Petitioners, FR8 Pride Shipping Corp. and Thome Ship Management PTE Ltd, filed this admiralty action on June 6, 2012 seeking a limitation of their liability. (D.E. 1). On June 7, 2012, they filed a motion for an expedited hearing. (D.E. 2). That motion was referred to a magistrate judge. Claimants, Rowan Companies, Inc., Rowan Luxembourg, s.a.r.l., and Rowan Drilling (Gibraltar) Ltd., filed a response to the request for a limitation of liability. (D.E. 10). For the following reasons, a bond on the M/V FR8 PRIDE is set a $20 million.

### I. JURISDICTION

This Court has jurisdiction over maritime claims pursuant to 28 U.S.C. § 1333.

### II. BACKGROUND

On February 17, 2012, Petitioner's vessel M/V FR8 PRIDE, a petrochemical tanker, was delivered for charter in Paulsboro, New Jersey pursuant to a pool agreement between Petitioners and Scorpio Panamax Tanker Pool, Ltd. That same day, the vessel left New Jersey for Luanda, Angola. On March 8, 2012, it arrived in Angola receiving a load of crude oil bound for Corpus Christi, Texas.

On May 2, 2012, the M/V FR8 PRIDE arrived into the Port of Corpus Christi Ship

Channel to deliver the crude oil.  At that same time, the MODU Rowan EXL-1 jack-up rig, which is owned by Claimants, was also entering the ship channel.  At 7:15 a.m., the M/V FR8 PRIDE experienced engine failure and lost propulsion.  Consequently, the M/V FR8 PRIDE and the Rig collided resulting in damage to both vessels.

On May 18, 2012, Claimants filed a maritime claim against M/V FR8 PRIDE, Petitioners, Scorpio Panamax Tanker Pool, Ltd., and Scorpio USA, LLC seeking to recover for damages to the Rig.  See Rowan Cos. v. M/V FR8 PRIDE, C-12-163 (S.D. Tex.).  Petitioners have indicated that the there may be other claimants based on the May 2 accident, including Crosby Tugs, Signet Marine, cargo underwriters, and individuals working on the Rig who may have suffered injuries.

**A.     Evidence Regarding Value Of M/V FR8 PRIDE On May 2, 2012.**

On June 15, 2012, a hearing was held regarding the request for a limitation of liability.  Petitioners as well as Claimants appeared through counsel.

Petitioners first called Paul Willcox to testify regarding the M/V FR8 PRIDE's value just prior to the accident.  He testified that after graduating from Cambridge University in 1974, he began working for international shipbrokers The Eggar Forrester Group Ltd.  In about 1987, Eggar Forrester acquired C.W. Kellock and Co. Ltd., which is the ship broker and valuer used by the Admiralty Marshal of the Courts of Justice in England and Wales.  Currently, Mr. Willcox is Chairman of Eggar Forrester and Managing Director of C.W. Kellock.

When Mr. Willcox joined Eggar Forrester, he specialized as a ship sale and purchase broker.  Since 2000, he has been the sworn valuer of ships to the Admiralty Marshal of the Courts of Justice in England and Wales.  In that position, he provides an impartial valuation of

ships for the Court.  He has also testified as an expert regarding ship valuations in English courts as well as in a bankruptcy proceeding in the Houston Division of the Southern District of Texas in November 2011.  He estimates that in the last ten years, he has valued over 3,500 ships, including about 400 ships in the last twelve months.  In order to provide a valuation, he considers several factors, including the specifications of the vessel, any survey report provided, recent past sales of similar ships, and what similar ships are being offered for sale on the market.  In order to prepare his valuations, he maintains his own database regarding ship values and sales as well as has a network of market contacts.  Regarding the specifics of a ship, he considers inter alia what year it was built, its length, its tonnage, where it can trade, the type of vessel it is, and where the vessel was built.

Mr. Willcox described ship valuation as both an art and a science with the latter based in large part to objective information, and the former subjective interpretation of non-quantifiable factors.  On cross-examination, he admitted that there is some subjectivity to valuations and that others have disagreed with his valuations.

Regarding the M/V FR8 PRIDE, Mr. Willcox testified that it was delivered in 2006 from the New Century Shipyard in China.  He explained that where a vessel is built affects its value and that ships built in Chinese shipyards are not as valuable as those built in South Korean and Japanese shipyards.  He further testified that the M/V FR8 PRIDE is a Panamax tanker, with 74,340 dead weight tonnage, which is carrying capacity, and a length 228 meters.  See Pls. Ex. 1, 2.  In reaching his valuation, he specifically focused on the vessel's size, its specifications, as well as the year and place it was built.  He also looked at comparable sales.

In the six month period leading up to the May 2 valuation date, there were very few

comparable sales.  However, Mr. Willcox indicated that the there was one extremely comparable sale.  This vessel, the tanker TORM UGLAND, was a sister ship of the M/V FR8 PRIDE, which was built in the same shipyard with the same specifications and delivered one year later in 2007.  Thus, except for being one year newer than the M/V FR8 PRIDE, he characterized the TORM UGLAND as the M/V FR8 PRIDE's twin.  The TORM UGLAND was owned in a partnership between two companies, Torm and Ugland, with each entity have a fifty percent share in the vessel.  Pursuant to the partnership agreement, Torm caused the vessel to be placed on sale.

In early 2012, the TORM UGLAND was placed on the market widely throughout the world.  In March 2012, it was reported that the vessel was sold on subjects, which means that the buyer had an option on the sale, for $22.5 million.  By April 20, 2012, however, this sale had fallen through and the vessel was placed back on the market.  Another purchaser offered $21.5 million for the vessel.  At that price, consistent with the partnership agreement, Ugland exercised its right to acquire one hundred percent ownership of the vessel.  Thus, Ugland through its subsidiary Siva essentially paid Torm about $10.75 million to acquire all of the partnership's shares and thus buy the TORM UGLAND.  See Pls. Ex. 3.  Mr. Willcox characterized all this marketing activity as a price-checking exercise with the purchase price reflecting a value of $21.5 million.  On cross-examination, he acknowledged that this price of $21.5 million was good enough of a deal that Ugland decided to buy out its partner and keep the vessel for itself.  On redirect, he further explained that it unusual for a valuer to find such a similar sold vessel when preparing a valuation because it was almost the same ship widely marketed.

Mr. Willcox testified that his usual practice was to use a six percent annum depreciation rate.  He further indicated that this rate is widely accepted in the industry.

On June 14, 2012, the day prior to the hearing, Claimants filed their response to Petitioners' request for a limitation fund. (D.E. 9). In that filing, they included a Certificate of Valuation for the M/V FR8 PRIDE as of May 2, 2012 valuing the vessel at $21.8 million. Id. at Ex. A; accord Pls. Ex. 4. VesselsValue.com is a company operated in London by Seasure Shipping, a ship brokering company. Mr. Willcox testified that this Certificate of Valuation is not intended as a formal valuation as evidenced by its disclaimer "this valuation is not a substitute for a formal valuation or independent inspection and advice, which you should obtain. You should not rely on this valuation to conduct any transaction, nor should you use or rely upon this valuation as market information, or for gathering such information, related to any prospectus, or bond issue, or other financial offer document." Pls. Ex. 4, at 3. He explained that this Certificate of Valuation is created by a computer after a number of inputs are entered regarding the subject vessel. As such, this document reflects simply the science of ship valuation without the art of the valuation.

The Certificate of Valuation lists ten previous sales of vessels as comparables, but Mr. Willcox does not view them as adequate comparables as they are all different types of vessels from the M/V FR8 PRIDE. This certificate does not include the sale of the TORM UGLAND even though Seasure Shipping was aware of that sale. On cross-examination, he addressed some of the vessels, including two nearly identical tankers built in 2008 that each sold for $32.6 million on March 7, 2012: the Libyan Galaxy and the Arctic Galaxy. Similarly, another 2008 vessel, the Ice Blizzard, which had a dead weight of over 10,000 tons less than the M/V FR8 PRIDE, sold for $36 million in December 2011. See Defs. Ex. 1. Mr. Willcox noted that it was a very specific type of ship not truly comparable to the M/V FR8 PRIDE. Next, he testified that

on October 20, 2011, the Singapore River, which was built in 2002, sold for $21.6 million. Additionally, on October 14, 2011, the tanker Torm Mette sold for $38.5 million.

On redirect, Mr. Willcox explained that each vessel was distinguishable for a number of reasons, including dead weight tonnage and the shipyard where it was built. He further indicated that the market had been sliding and declined further between March and May 2012. The market has collapsed by at least ten percent during that two month period. For example, VesselsValue.com had provided a reported value of $23.9 million for the TORM UGLAND at the time they were reporting it sold for $22.5 million.

On June 14, 2012, Mr. Willcox visited the M/V FR8 PRIDE. Based on that visual inspection, his opinion about the vessel's value was not altered. Given all of the various factors and considerations, it is his opinion that the M/V FR8 PRIDE was worth $21 million on May 2, 2012 prior to the accident.

**B.     Evidence Regarding Permanent Repair Costs Suffered By M/V FR8 PRIDE From The May 2, 2012 Accident.**

Next, Petitioners called Keith Reay to testify regarding the permanent repair costs. He testified that he is a marine engineering consultant who is currently employed by 3D Marine USA, Inc. in Houston, Texas. He has an degree in engineering from London University as well as a chief engineer's license. He started as a junior engineer spending eleven years at sea before progressing to be a chief engineer and then went ashore as a superintendent engineer working for three large British shipping companies. After joining 3D Marine, he prepares damage estimates for cargo ships. He has been retained as an expert and provided damage estimates through reports and depositions in many cases.

Mr. Reay testified that he has been hired to prepare a number of similar estimates. In

doing so, he first he examines and documents the damages, particularly the sizes of the damaged areas. He attempts to calculate the weight of the steel necessary for the repair. He also assesses the damage to areas requiring repair that does not involve steel.

Mr. Reay testified that he personally inspected the M/V FR8 PRIDE after the accident to assess the cost of repairs. He viewed and photographed all of the damage areas of the vessel, which included the deck and the inside of the tank. He took many measurements of the damaged steel. Then he prepared a detailed report addressing the damages he viewed. See Pls. Ex. 5. In conjunction with this report he prepared spreadsheets itemizing the expenses of each specific repair based on steel and labor costs. See Pls. Ex. 6. He also provided numerous photographs that he took of the damage. See Pls. Ex. 7. The damages were in two main areas. Based on his inspection and his calculations, he concluded that the permanent repair costs were $2,105,898. Pls. Ex. 6, at 4.

Mr. Reay testified that the M/V FR8 PRIDE is currently not safe to leave the port without some temporary repairs. After such repairs, it will depart for a site where the permanent repairs can be made. His estimate does not include the temporary repairs that need to be made. The amount $2,105,898 includes lost opportunity costs for the hire of the vessel in the amount of $930,000. Pls. Ex. 6, at 4-5.

**C.     Evidence Regarding Value Of M/V FR8 PRIDE's Pending Freight On May 2, 2012.**

Finally, Petitioner offered a declaration by Roger Woods regarding the value of the pending freight. (D.E. 1, Ex. C). He is employed as General Manager of Projects by FR8 Ship Brokers, Ltd., and his duties included managing the M/V FR8 PRIDE's charter. Id. at ¶ 2. The pending freight valuation is determined based on the pool arrangement with Scorpio Panamax

Tanker Pool for the journey from New Jersey to Angola to Corpus Christi.  Id. at ¶ 4.  Based on that arrangement, he concluded that the value owed to Petitioners for pending freight is $1,021,676.  Petitioners' counsel was unable to explain how this value was derived, but instead indicated that it was too complex.  Claimants' counsel indicated that he did not have any information to challenge this estimate, but concedes that this estimation may be accurate.

### III.  DISCUSSION

Rule F of the Supplemental Rules For Admiralty or Maritime Claims provides for actions to limit a vessel owner's liability.  In such claims, "the liability of the owner of a vessel for any claim, debt or liability [including injury by collision] shall not exceed the value of the vessel and pending freight."  46 U.S.C. § 30505(a); accord Lewis v. Lewis & Clark Marine, Inc., 531 U.S. 438, 446 (2001) (quoting 46 U.S.C. App. § 183(a)); In re Tetra Applied Techs. LP, 362 F.3d 338, 340 (5th Cir. 2004) (same).  Petitioners have the burden of establishing the value for purposes of any limitation of liability.  See Collins v. Cottrell Contracting Co., 733 F. Supp. 690, 706 (E.D.N.C. 2010); The Rapel, 78 F. Supp. 78, 80 (S.D.N.Y. 1948).

At the hearing, the parties acknowledged that the urgency regarding the expedited hearing stemmed from Petitioners' desire to obtain a bond for the M/V FR8 PRIDE so that it could return to service.  Moreover, Claimants' counsel did not vigorously challenge Mr. Willcox's value of the M/V FR8 PRIDE, Mr. Reay's estimation of the permanent repair costs, or the purported value of the pending freight.  This lack of a challenge was due in part to the fact that Claimants' counsel had just received the report prepared by Mr. Reay, and Mr. Woods was not present to testify about a calculation so complex that even Petitioners' counsel conceded that she did not understand it.  While Claimants' counsel gave the impression that he disagreed

slightly with the components of the value put forth by Petitioners, he indicated that it nonetheless appeared within a reasonable range.  For example, he proposed that the lost opportunity costs be removed from the permanent repair costs.  Petitioners countered that there is case law supporting their approach, but did not provide it.

Claimants' counsel indicated that he had proposed entering stipulations about the value, but Petitioners were hesitant because of the belief that such a stipulation would have a limited effect on other potential claimants.  Such claimants might want to challenge the value proposed by Petitioners.  Setting a bond at this juncture will enable Petitioners to have their vessel back in service while safeguarding Claimants' interests as well as the interests of potential claimants.  Furthermore, such an approach enables Petitioners to marshal their evidence so as to fully meet their burden as well as allow for any necessary discovery regarding the ultimate appropriate value for any limitation of liability amount.

## IV.  CONCLUSION

Accordingly, bond on the vessel M/V FR8 PRIDE is set in the amount of $20 million.

ORDERED this 18th day of June 2012.

_____
BRIAN  L. OWSLEY
UNITED STATES MAGISTRATE JUDGE